FILED

MAY 01 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>EDWARD J. STOUT,<br><br>　　　　　Debtor.<br>_____<br>DOLORES STOUT; KAUFMANN GROUP, INC.<br><br>　　　　　Appellants,<br><br>v.<br><br>RICHARD A. MARSHACK, Chapter 7 Trustee; STEVEN ROOT; JAMES KERCHNER; QUALTECH BACKPLANES, INC.; ELECTRONIC CONNECTOR SERVICE; DYNAMIC STAMPING,<br><br>　　　　　Appellees.<br>_____<br>STEVEN ROOT; JAMES KERCHNER,<br><br>　　　　　Appellants,<br><br>v.<br><br>EDWARD J. STOUT,<br><br>　　　　　Appellee.<br>_____ | BAP Nos.　CC-13-1045-DKiTa<br>　　　　　　CC-13-1257-DKiTa<br>　　　　　　(related appeals)<br><br>Bk. No.　09-17134-ES<br><br>Adv. Nos. 11-01026-ES<br>　　　　　09-01669-ES<br><br><br>**M E M O R A N D U M**[1] |

Argued and Submitted on March 20, 2014
at Pasadena, California

Filed - May 1, 2014

_____

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Appeals from the United States Bankruptcy Court
Honorable Erithe A. Smith, Bankruptcy Judge, Presiding

Appearances:    Richard Edwin Masson, Esq. of Masson & Fatin, LLP argued for Dolores Stout and Kaufman Group, Inc., appellants in 13-1045; John Robert Armstrong, II, Esq. of Horwitz Cron & Armstrong LLP argued for Richard A. Marshack, Chapter 7 Trustee, appellee in 13-1045 and for James Kerchner and Steven Root, appellees in 13-1045 and appellants in 13-1257; Michael S. Winsten, Esq. of Winsten Law Group argued for Edward J. Stout, appellee in 13-1257.

Before: DUNN, KIRSCHER and TAYLOR, Bankruptcy Judges.

We consider two related appeals arising out of the same set of facts involving the debtor, Edward Stout, his mother, Dolores Stout ("Dolores"), and her company, Kaufman Group, Inc. ("Kaufman Group"), and three of the debtor's creditors, Jim Kerchner ("Kerchner"), Steve Root ("Root") and Qualtech Backplanes, Inc. ("Qualtech")(collectively, "Creditors").

The two appeals concern transfers of assets by the debtor to Dolores. One of the appeals (BAP No. CC-13-1045) involves an adversary proceeding (AP No. 11-1026) initiated by the chapter 7[2] trustee ("Trustee") and Creditors (who joined as co-plaintiffs) against Dolores and Kaufman Group (together, "Dolores") under §§ 547(b), 548(a) and 550 ("Preference Adversary"). Trustee and

---

[2] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Creditors later moved for partial summary judgment on their §§ 547(b) and 548(a)(1) claims against Dolores and Kaufman Group. The bankruptcy court granted partial summary judgment in favor of Trustee and Creditors on their § 547(b) claim ("§ 547(b) partial summary judgment order"). Dolores appeals the bankruptcy court's grant of partial summary judgment.

The second appeal (BAP No. CC-13-1257) involves an adversary proceeding (AP No. 09-1669) initiated by Creditors against the debtor seeking to except their debt from discharge under § 523(a)(6) and to deny the debtor's discharge under § 727(a)(2)(A)("Discharge Adversary"). There, the bankruptcy court ultimately ruled in the debtor's favor on both claims. Creditors subsequently moved to set aside the findings or for a new trial ("motion for new trial") under Civil Rules 52(a) and 59(a)[3] and Rules 9013-4(a)(2), (7) and (8) of the Local Bankruptcy Rules for the Central District of California.[4] The bankruptcy court denied the motion for new trial ("new trial order"); the Creditors now appeal. Creditors moreover appeal the bankruptcy court's judgment in the debtor's favor on their § 727(a)(2)(A) claim ("§ 727(a)(2)(A) judgment").

For the reasons set forth below, we AFFIRM the § 547(b) partial summary judgment order, the new trial order to the extent

---

[3] Civil Rule 52 is made applicable through Rule 7052. Civil Rule 59 is made applicable through Rule 9023.

[4] Creditors did not specify in their motion for new trial the subsections of Civil Rules 52(a) and 59(a) that apply. Based on our review of the record and briefs before us, we assume that Creditors intended Civil Rules 52(a)(6) and 59(a)(1)(B) to apply.

it dealt with Creditors' § 523(a)(6) claim, and the § 727(a)(2)(A) judgment.

**FACTS**

A.   Events prior to the debtor's chapter 7 bankruptcy

Prepetition, the debtor wholly owned and operated Dynamic Stamping, Inc. ("Dynamic"), Electronic Connector Service, Inc. ("Electronic"), and Qualtech Applied Engineering Corp. ("Applied")(collectively, "businesses").[5] Dynamic, Electronic and Applied designed, made and/or assembled specialized electronic components.

Kerchner and Root owned and operated Qualtech, a company that made and sold various electronic connectors. It leased from Lapco Industrial Parks ("landlord") its manufacturing and office facilities ("facility") located in Santa Ana, California.

On September 18, 2006, the debtor and Creditors entered into an asset purchase agreement ("Asset Purchase Agreement") whereby Creditors sold Qualtech's business to the debtor ("Qualtech sale"). Specifically, under the Asset Purchase Agreement, the debtor purchased substantially all of Qualtech's assets ("Qualtech Assets")[6] for $250,000 cash.

---

[5] Applied formerly was known as Zip-Tron Corp. ("ZTC"). ZTC was incorporated in Nevada on May 1, 2000. It qualified to do business in California on April 16, 2001. ZTC changed its name to "Qualtech Applied Engineering Corp." on October 10, 2006.

[6] We use the term "Qualtech Assets" in the very limited and specific sense of the Qualtech assets sold in the Qualtech sale. Assets of the debtor, Dynamic, Electronic and Applied, as continue...

4

However, the debtor did not intend to own the Qualtech Assets. He expressed his intent in the Asset Purchase Agreement to assign his rights and obligations under the Asset Purchase Agreement to Applied.

Specifically, Article 2, Section 2.01 of the Asset Purchase Agreement provided:

> [The debtor] plans to assign his rights, and delegate his obligations, under this [Asset Purchase Agreement], to a legal entity to be formed. Such legal entity may be a corporation or a limited liability company so long as it is wholly owned and controlled by [the debtor]. In connection with such assignment and delegation, [the debtor] and such legal entity shall execute and deliver an Assignment and Assumption Agreement [("Assignment")] . . . .

The Assignment named Applied as the assignee. Article 1, Section 1.01 of the Assignment provided:

> [The debtor] hereby assigns to [Applied] all of his rights, and hereby delegates to [Applied] all of his duties, under the Asset Purchase Agreement. [Applied] hereby accepts such assignment and delegation.

The Assignment further provided that Applied "will own and operate [Qualtech's] Business after the [sale] Closing (as defined in the Asset Purchase Agreement)." Qualtech consented to the assignment.[7]

---

[6]...continue relevant to this disposition, are referred to collectively as the "Business Assets."

[7] We have taken some of the facts from a joint pretrial order filed and entered on December 29, 2011, in the docket of AP No. 09-1669. We exercise our discretion to take judicial notice of documents electronically filed in the adversary proceeding. See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

5

Although the debtor assigned to Applied all of his rights and obligations under the Asset Purchase Agreement, "[s]uch assignment and delegation shall not act as a release of [the debtor] and [he] shall remain legally responsible for the performance of all of the obligations of Buyer (as defined in the Asset Purchase Agreement) under the Asset Purchase Agreement."

The debtor also entered into a sublease with Qualtech to lease its facility ("sublease"), agreeing to pay all of the rent for the facility. He agreed to hold Qualtech harmless from any liability arising from any failure to perform under the sublease. The landlord consented to the sublease.

The debtor further entered into separate consulting agreements with Root and Kerchner whereby they each agreed to provide consulting services relating to Applied's business in exchange for consulting fees totaling $375,000 each. The debtor was to pay the consulting fees in equal monthly installments over five years.

Qualtech expressed its intent in the Asset Purchase Agreement to cease all business activities following the sale. However, Qualtech would continue to remain obligated as the master tenant for the facility. Qualtech became inactive on April 1, 2008. However, Qualtech later obtained a certificate of revivor effective August 23, 2010.

For several years, the debtor operated the businesses out of the facility. The debtor's mother, Dolores, took care of various administrative matters for the businesses. She also was an officer and director of the businesses.

Dolores helped the debtor and the businesses in other ways

6

as well.  Under two separate loan agreements, both dated June 20, 2005,[8] Dolores loaned the debtor and the businesses a total of $250,000.  According to the debtor, he needed the funds "to close out the deal with [Root] and [Kerchner]."  As noted above, the purchase price for the Qualtech Assets under the Asset Purchase Agreement was $250,000.

On November 1, 2006, Applied, Electronic and the debtor obtained a $1 million loan from Vineyard Bank.  Vineyard Bank filed UCC-1 financing statements perfecting its security interests in the assets of Applied and Electronic in November 2006.

Pursuant to the loan agreements, Dolores sent the debtor a written notice of demand, dated January 8, 2008 ("demand letter"), requiring the debtor to make full payment by March 15,

---

[8] The debtor and Dolores entered into a loan agreement, dated June 20, 2005, wherein Dolores loaned the debtor $250,000, payable within 60 days of Dolores providing a written notice of demand.  The debtor personally guaranteed the loan, granting Dolores a security interest in "his assets and properties until this Loan is paid in full."

The businesses (i.e., Dynamic, Electronic and Applied) and Dolores entered into their own loan agreement, also dated June 20, 2005, wherein Dolores loaned the businesses $250,000, payable within 60 days of Dolores providing a written notice of demand.  The loan to the businesses was "secured by the following equipment (the Security): All current and future assets of the [businesses]."  The businesses granted Dolores a security interest in "the Security until this Loan is paid in full."  As president and CEO of the businesses, the debtor signed the loan agreement on their behalf.

Notably, the two loan agreements contained nearly identical provisions.  The record reflects that the two loan agreements encompassed a single $250,000 loan.  Dolores did not file a UCC-1 financing statement to perfect her security interest at the time.

2008.[9] When the debtor failed to comply with the demand letter, she sent another letter, dated March 26, 2008, advising him that she was exercising her right under the loan agreements to repossess the Business Assets.[10]

The debtor and Dolores thereafter entered into a loan resolution agreement, dated March 31, 2008. Under the loan resolution agreement, Dolores was to take immediate possession of her collateral.[11] No mention was made in the loan resolution agreement of Dolores foreclosing her security interest in the Business Assets. The loan resolution agreement further does not provide for any transfer of title or ownership of the Business Assets, and the Business Assets apparently remained in place. Dolores agreed to lease the equipment to the debtor on certain conditions, including: 1) Dolores making payments on the

[9] In the demand letter, Dolores stated that she had made a $250,000 loan to Dynamic. She listed both the debtor and Dynamic as addressees. However, she addressed the debtor directly and sought repayment from him.

[10] In the March 26, 2008 letter, Dolores advised the debtor that she was going to "exercise her rights under section 6 of the agreement and take possession of the security items defined in our agreement." Dolores also stated that she was "disappointed that [the debtor] did not comply with her request of January 8, 2008 for repayment of the $250,000 [she] loaned [the debtor] on June 20, 2005."
In the March 26, 2008 letter, Dolores addressed the debtor directly (i.e., as the recipient). As in the demand letter, she also listed both the debtor and Dynamic as the addressees.

[11] The loan resolution agreement stated that it was between the debtor and Dolores. It also stated that "[i]n exchange for the option to use this equipment, [Dolores would] lease use of it to [the debtor] . . . ." The debtor did not list any equipment among his personal property assets on Schedule B.

8

debtor's line of credit; and 2) the debtor paying Dolores $6,000 per month, starting in April 2009.

In a letter dated June 19, 2008, Dolores informed the debtor that she was "unhappy" with the "direction and results of the company." She advised him that she was "exercising her right to demand payment in full of $165,000." However, to make repayment easier for him, Dolores declined to collect interest on the loan. She purportedly obtained a lien securing future repayment of the loan, recognizing that "the current economic conditions of the company" made immediate repayment difficult. There is no evidence in the record that Dolores took any action to have the "lien" attach or to perfect it; she only referenced the lien in her letter.

Thereafter, on January 1, 2009, Applied defaulted under the lease by failing to pay the rent for the facility. After notifying Applied and the debtor of the default, the landlord initiated an unlawful detainer action against Creditors, Applied and the debtor. On March 23, 2009, the landlord obtained a $205,470.84 judgment against Creditors for past due rent and rental value damages and attorney's fees and costs ("landlord judgment").

Contributing to the flurry of collection activity against the debtor and the businesses, Dolores sent the debtor a letter, dated April 30, 2009 ("breach of contract letter"). In the breach of contract letter, Dolores notified the debtor that she would take immediate possession of all of Dynamic's equipment, tools, etc., as the debtor had failed to make the monthly loan payments in breach of the loan agreement. Again, apparently all

9

of the Business Assets remained in place.

Due to the landlord judgment against them, on May 8, 2009, Creditors initiated a state court action against the debtor and Applied for breach of the sublease, declaratory relief as to the right of indemnity from Applied and the debtor on the landlord judgment and breach of guaranty against the debtor ("state court action").

On June 8, 2009, the debtor and Dolores entered into a "voluntary foreclosure and repossession agreement" ("turnover agreement"). Under the turnover agreement, Dolores took all of the debtor's right, title and interest in and possession of the Business Assets, which included Dynamic's and Electronic's machines, tools and equipment. Specifically, the turnover agreement provided:

> [The debtor] hereby continuously and irrevocably tenders to [Dolores] without need of judicial proceedings, all right, title and interest, and full possession of, in and to all of its Asset Collateral, which [the debtor] now owns or will own as a result of the daily operation of its business. All such Asset Collateral not now in [Dolores'] possession shall be deemed received and held by [the debtor] in trust for and subject to the sole discretion of [Dolores] until [her] acceptance of such tender of possession.

Notably, the turnover agreement included a list of various machines and a list of equipment. Applied was not a party to the turnover agreement.

At the time she entered into the turnover agreement, Dolores was doing business as Kaufman Group. She soon transferred the Business Assets acquired under the turnover agreement to Kaufman Group. Using the Business Assets, Dolores began operating out of the facility, making and selling the same products previously

made and sold by the businesses.

Dynamic filed a certificate of dissolution with the California Secretary of State on June 22, 2009. Electronic and Applied filed certificates of dissolution with the California Secretary of State on July 10, 2009.

B.   The debtor's chapter 7 bankruptcy and adversary proceedings

On July 15, 2009, the debtor filed his chapter 7 bankruptcy petition. He listed his interests in Applied, Electronic and Dynamic on Schedule B, but noted that they were no longer in business. He did not list any of the Business Assets as his own. The debtor named Applied, Electronic and Dynamic as co-debtors on his Schedule H. He listed Dolores on Schedule F with a $250,000 general unsecured claim based on business debt.

The debtor also scheduled Kerchner and Root with general unsecured claims each in the amount of $605,000, both based on business debts. He also listed Vineyard Bank with a $1,165,000 general unsecured claim based on trade debt. Two months after the initial § 341(a) meeting, Trustee filed a no asset report on October 7, 2009.[12]

1.   Preference Adversary

On January 1, 2011, Trustee and Creditors filed a complaint against Dolores (AP No. 11-1026) under §§ 547, 548, 550 and 551 to commence the Preference Adversary.

In their complaint, Trustee and Creditors highlighted the lack of documentation for the following in their allegations: 1) attachment and perfection of Dolores' security interests and

_____

[12] The debtor received his discharge on March 25, 2013.

11

liens in the Business Assets; 2) the provision of the loan funds to the debtor and the businesses; 3) the transfer of the Qualtech Assets to Applied; and 4) the repossession of the Business Assets by Dolores. They also pointed out that the debtor, the businesses and/or Dolores did not provide any third party notice of the transfer of the Business Assets to Dolores.

Trustee and Creditors further alleged that there was such a unity of interest between the debtor and Dolores and the businesses, the businesses were their alter egos. They cited numerous examples in support, including allegations that: 1) funds were moved between the businesses without regard to the source or obligations; 2) the businesses had the same officers and directors (i.e., the debtor and Dolores); 3) Kaufman Group continued to use the trade names of Applied and Electronic and to service the same customers; and 4) the debtor received compensation (in the form of payment for his rent and the use of a Mercedes Benz for his wife) for providing consultation services to Kaufman Group.

They also pointed out that the debtor scheduled Dolores as a general unsecured creditor, even though she took possession of the Business Assets prepetition and supposedly had a valid security interest in them. Moreover, even though the debtor transferred the Business Assets to Dolores as a form of payment on the $250,000 loan, he did not characterize the transfer in his bankruptcy schedules as a credit against the debt owed to Dolores.

Given these facts, Trustee and Creditors argued that the debtor and Dolores fraudulently transferred the Business Assets

12

to Dolores through their alter egos in order to thwart Creditors' attempts to obtain judgment against the debtor, and to continue the operations of the businesses.

Seven months after Dolores filed her answer, Trustee and Creditors moved for partial summary judgment against them on the §§ 547(b) and 548(a)(1) claims ("partial summary judgment motion").

With respect to their § 547(b) claim, Trustee and Creditors averred that they met all of the elements for establishing an avoidable preferential transfer. They focused on one element in particular: the Business Assets as property of the debtor and/or the bankruptcy estate.

Trustee and Creditors contended that because the debtor wholly owned the businesses, they became assets of the bankruptcy estate when he filed for bankruptcy. Under Cal. Corp. Code § 2004, corporate assets are distributed to shareholders upon dissolution of the corporation. Here, had the debtor not transferred the Business Assets to Dolores, they would have been distributed to him as the sole shareholder. The Business Assets then would have become part of the bankruptcy estate when he filed for bankruptcy.

Alternatively, Trustee and Creditors claimed that the debtor owned the Qualtech Assets, not Applied. He never produced documents showing that he transferred the Qualtech Assets to Applied pursuant to the Asset Purchase Agreement and Assignment. Moreover, he treated the Business Assets as his personal assets when he pledged them as security on the personal loan.

Trustee and Creditors further argued that the debtor

13

actually owned the Business Assets because the businesses were his alter egos. Under California law, although a corporation typically is an entity separate and distinct from its stockholders, it is considered an individual's alter ego when there is such a unity of interest between the individual and the corporation as to negate the corporation's separateness. In other words, the corporation is considered the individual's alter ego when he uses it for convenience to transact his business in such a way that amounts to fraud or injustice against third parties.

Here, the debtor admitted at the § 341(a) meeting that he moved funds between the businesses without regard to the source or obligations, even though he maintained separate bank accounts. Also, the debtor was the sole shareholder of the businesses. He and Dolores were the only officers and directors of the businesses.

As for the § 548(a)(1) claim, Trustee and Creditors contended that the debtor received less than reasonably equivalent value in exchange for the transfer of the Business Assets to Dolores. Specifically, although he owed Dolores only $250,000, he transferred all of the Business Assets, which were worth more than $560,000.

They also argued that, based on circumstances surrounding the transfers, the debtor had actual intent to hinder, delay or defraud creditors when he transferred the Business Assets to Dolores. Several badges of fraud existed, demonstrating the debtor's fraudulent intent, including: 1) as an officer and director of the businesses, Dolores was an insider; 2) the debtor

14

concealed the transfer by failing to provide public notice to creditors and by failing to comply with California bulk sales law; 3) the debtor transferred the Business Assets to Dolores less than a month after being served with Creditors' state court complaint; and 4) the debtor became insolvent after he transferred the Business Assets to Dolores.

Dolores opposed the partial summary judgment motion asserting that Trustee and Creditors failed to show that no material factual issues existed as to their §§ 547(b) and 548(a) claims.

With respect to the § 547(b) claim, Dolores contended that Trustee and Creditors could not show that no material factual issue existed as to whether the transfer involved property of the debtor. She claimed that evidence showed that the debtor never personally owned the Business Assets. Under the Asset Purchase Agreement, Applied was the intended purchaser of the Qualtech Assets. The debtor simply was the placeholder, holding the Qualtech Assets until Applied could be established. The Assignment further supports this intent.

Also, the Business Assets did not belong to the debtor because Dolores took possession of the Business Assets on March 31, 2008, then leased them back to the debtor and the businesses. Neither the debtor nor the businesses owned the Business Assets after March 31, 2008; they simply were leasing them. In other words, they held a leasehold interest in the Business Assets only, similar to holding the Business Assets in trust for Dolores.

Moreover, the transfer of the Business Assets to Dolores

15

occurred outside of the statutory preference period under § 547(b). Section 547(b)(4)(B) requires that the transfer take place up to one year prepetition. Here, Dolores took possession of the Business Assets on March 31, 2008.

She also disputed Trustee and Creditors' allegation that the businesses were her and the debtor's alter egos. Each of the businesses filed its own tax returns, conducted separate operations and maintained separate books and records. Funds were transferred between the businesses because goods and services were exchanged between them. Further, Dolores made loans to each of the businesses and the debtor separately. The debtor did not use all of the loans for his personal benefit. Additionally, Dolores was not paying the debtor a consulting fee; she simply was helping his family with its expenses.

Dolores further argued that Trustee and Creditors failed to show that no material factual issue existed as to whether Dolores received more than she would have under a chapter 7 liquidation. She was a secured creditor who was entitled to repayment of the entire loan. Payment to a fully secured creditor is not preferential because it does not deplete the bankruptcy estate as such payment reduces the secured creditor's lien in an equal amount.

Dolores also raised the new value defense under § 547(c)(1), claiming that she and the debtor intended that the transfer of the Business Assets be a contemporaneous exchange for new value given to him.

The bankruptcy court held a hearing on the partial summary judgment motion on September 18, 2012. It concluded that the

16

debtor's ownership interests in the businesses constituted property of the estate within the meaning of § 541. The bankruptcy court referenced the loan agreements, the loan resolution agreement and the turnover agreement. It pointed out that all of these agreements had been between the debtor and Dolores. The bankruptcy court acknowledged that

> [S]ome other entities that [the debtor] controlled also had an interest in all those assets. But it [was] pretty clear that – you look at the agreements between Dolores Stout and Edward Stout, and the reference to the assets is the reference to him. It's only to him individually, in the body of the actual document.

Tr. of Sept. 18, 2012 hr'g, 6:7-12.

The bankruptcy court also determined that the perfection of Dolores's security interests, through the filing of a UCC-1 financing statement on May 27, 2009, was within the preference period. At the summary judgment hearing, the bankruptcy court wondered, "[i]f [Dolores] was the owner of the property, why on earth would she file a UCC-1 in 2009, on her own property?" Tr. of Sept. 18, 2012 h'rg, 2:22-25. It also noted that Dolores took further steps to perfect her security interest by executing the turnover agreement, which allowed her to take possession of the Business Assets immediately.

The bankruptcy court also concluded that Dolores was an insider within the meaning of § 101(31) as she was the debtor's mother. Consequently, the one-year reach back period of § 547(b)(4)(B) applied. It thus granted summary judgment on the § 547(b) claim, concluding that no genuine triable factual issues existed as to that claim.

The bankruptcy court denied summary judgment on the

17

§ 548(a)(1) claim. It found that triable issues of material fact existed as to the § 548(a)(1) claim.[13]

On January 23, 2013, the bankruptcy court entered the § 547(b) partial summary judgment order in favor of Creditors. Dolores timely appealed the § 547(b) partial summary judgment order. The bankruptcy court entered a Rule 54(b) certification thereafter.

### 2. Discharge Adversary

On October 20, 2009, before the Preference Adversary was filed, Creditors filed a complaint ("Discharge Complaint") against the debtor, initially asserting a claim under § 727(a)(2)(A) only. Under a stipulation entered February 9, 2010, the debtor agreed to allow Creditors to amend their complaint to include a claim under § 523(a)(6). AP No. 09-1669 Docket Nos. 9 and 10. Creditors filed their amended complaint on March 16, 2010, including a claim under § 523(a)(6).

With respect to their § 523(a)(6) claim, Creditors asserted that the businesses were the debtor's alter egos. They then alleged that the debtor "conspired" with Dolores "to thwart" the pending state court action and to hinder, delay and defraud them by fraudulently transferring the Business Assets to Dolores and/or Kaufman Group. Finally, they alleged that such acts willfully and maliciously injured Creditors.

Alternatively, they argued that the debtor's discharge should be denied under § 727(a)(2)(A) because, within one year

---

[13] Since disposition of the § 548(a)(1) claim has no relevance to the disposition in this appeal, we will not refer to it further herein.

18

prior to filing for bankruptcy, he transferred the Business Assets to Dolores and/or Kaufman Group with the intent to prevent Creditors from obtaining and collecting a judgment against him in the state court action.

Several months after he filed his answer to the Discharge Complaint, the debtor moved for summary judgment ("debtor summary judgment motion"), asserting that Creditors failed to establish the elements of their § 727(a)(2)(A) and § 523(a)(6) claims.

With respect to the § 727(a)(2)(A) claim, the debtor argued that he never owned the Qualtech Assets at any time. At the time of the Qualtech sale, the debtor merely held the Qualtech Assets for Applied.[14] The Asset Purchase Agreement specifically contemplated that a business entity would be the "true" purchaser of the Qualtech Assets; the debtor simply was a placeholder. Moreover, Applied owned the Qualtech Assets until March 2008, when Dolores allegedly foreclosed on the Business Assets. Because the debtor never truly owned the Qualtech Assets, there could not have been a transfer within the meaning of § 727(a)(2)(A).

He also maintained that the businesses never were his alter egos. The businesses filed their own tax returns and maintained separate books and records. They also maintained separate bank accounts; they did not commingle any funds with the debtor.

The debtor further contended that the transfer of the Business Assets to Dolores occurred outside the one-year period

---

[14] The debtor advanced a number of arguments in his summary judgment motion, but we focus only on those relevant to the appeal.

under § 727(a)(2)(A). Although Dolores did not file her UCC-1 financing statement until May 27, 2009, the debtor alleged that she had a perfected security interest. The transfers of the Business Assets to Dolores through the attachment of her security interest became effective on June 20, 2005 when she signed the loan agreements.

He also contended that Creditors failed to show that he had actual intent to hinder, delay or defraud them at the time he transferred the Business Assets to Dolores. She had a valid security interest in the Business Assets pursuant to the loan agreements. Dolores acquired the Business Assets because the debtor failed to repay his debt to her, not because the debtor intended to prevent Creditors from obtaining a state court judgment against him.

As to the § 523(a)(6) claim,[15] the debtor argued that Creditors failed to show that he had a subjective intent to injure them when he transferred the Business Assets to Dolores. She had a valid security interest in the Business Assets; Dolores

---

[15] The debtor also argued that Creditors could not assert their § 523(a)(6) claim because it was time-barred under Rule 4007(c).

Rule 4007(c) provides that the deadline to file a complaint to except a debt from discharge, including under § 523(a)(6), is 60 days after the first date set for the § 341(a) meeting of creditors. The initial § 341(a) meeting of creditors in the debtor's bankruptcy case was scheduled for August 21, 2009. According to Form B9A, the "Notice of Commencement of Case under the Bankruptcy Code, Meeting of Creditors and Deadlines," that was filed and entered on July 20, 2009 in the debtor's bankruptcy case (main case docket no. 3), the deadline to file dischargeability complaints was October 20, 2009.

20

simply exercised her right to repossess them pursuant to the loan agreements.

He also argued that the debt owed to Creditors arose out of a breach of contract, which is not recognized as a debt excepted from discharge under any of the provisions of § 523(a).

The debtor further sought to dismiss Qualtech as a plaintiff. When Creditors filed the Discharge Complaint, Qualtech was suspended for failing to pay taxes. Qualtech therefore lacked the capacity to commence and prosecute the Discharge Adversary against him.

Creditors filed an opposition to the debtor's summary judgment motion. They opposed it on procedural grounds only, contending that the debtor filed his summary judgment motion untimely. They also argued that notice of the hearing on the summary judgment motion was defective as the notice was served untimely.

Before the December 16, 2010 hearing on the summary judgment motion,[16] the bankruptcy court issued a tentative ruling. In its tentative ruling, the bankruptcy court indicated an intent to grant the debtor's summary judgment motion as to the § 523(a)(6) claim, but to deny the summary judgment motion as to the § 727(a)(2)(A) claim. At the summary judgment hearing, the bankruptcy court adopted its tentative ruling.

---

[16] Within the Central District of California, a hearing automatically is scheduled on a motion for summary judgment, whether or not an opposition is filed. See Rule 7056-1(a) and Rule 9013-1(a)(5) of the Local Bankruptcy Rules for the Bankruptcy Court of the Central District of California.

21

On March 21, 2011, the bankruptcy court entered the § 523(a)(6) partial summary judgment order. It granted summary judgment in the debtor's favor as to the § 523(a)(6) claim on two grounds: first, concluding that the § 523(a)(6) claim was not timely filed and, further, determining that Creditors did not raise any material factual issue concerning the debtor's intent to cause injury within the meaning of § 523(a)(6).

The bankruptcy court denied summary judgment on the § 727(a)(2)(A) claim, determining that genuine material factual issues existed as to the following: 1) the significance and legal effect of the transfer of the Qualtech Assets to Applied; 2) the existence of alter ego; 3) the circumstances concerning Dolores' taking possession of the Business Assets; and 4) the debtor's intent to hinder, delay or defraud Creditors.

The bankruptcy court further determined that there was insufficient admissible evidence as to Qualtech's legal status as of the filing of the Discharge Complaint. It also determined that the debtor failed to address the issue involving Qualtech's certificate of revivor.

The remaining claim in the Discharge Complaint proceeded to trial. In preparation for the trial, the debtor and Creditors submitted a joint pretrial order.

In the joint pretrial order, they agreed and admitted to several facts, including that: 1) the debtor wholly owned and controlled the businesses by June 20, 2005; 2) Dolores was an officer and director of the businesses by June 20, 2005; 3) the debtor and the businesses entered into the loan agreements with Dolores; 4) the debtor or his allowed assignee was the purchaser

22

under the Asset Purchase Agreement; 5) the debtor personally guaranteed performance under the Asset Purchase Agreement, the sublease and the consulting agreements; 6) Dolores took possession of the Business Assets two months before the debtor filed his chapter 7 petition; and 7) Qualtech was under suspension from April 1, 2008 until August 23, 2010, when it filed its certificate of revivor.

The debtor and Creditors also listed several factual issues remaining to be litigated, including: 1) whether the debtor was the alter ego of the businesses; 2) whether the debtor acted to transfer, conceal, destroy or remove the Business Assets; and 3) whether the debtor had actual intent to defraud, delay or hinder Creditors through his actions within one year prepetition.

Before the trial, the bankruptcy court addressed several pretrial motions filed by the debtor. In one pretrial motion, the debtor again sought to dismiss Qualtech as a plaintiff for lack of standing to prosecute the Discharge Complaint ("pretrial motion"). AP No. 09-1669 Docket No. 82. Following a hearing, the bankruptcy court granted the pretrial motion, entering the order on May 15, 2012. AP No. 09-1669 Docket No. 138. It concluded that Qualtech lacked capacity to prosecute the Discharge Adversary because at the time it was filed on October 20, 2009, Qualtech was under suspension.

The bankruptcy court held a four-day trial. It issued its ruling orally on March 1, 2013 ("Trial Findings Hearing").

At the outset of the Trial Findings Hearing, the bankruptcy court stressed that it reviewed all admissible evidence independent from any other pending adversary proceeding, i.e.,

23

the Preference Adversary. It then went on to state that Creditors had established all but one of the elements of § 727(a)(2)(A).

It found that the debtor transferred all of the Business Assets to Dolores within one year of his bankruptcy filing with the actual intent to hinder, delay and defraud Creditors. The bankruptcy court noted that the evidence showed that the transfer of the Business Assets to Dolores "was designed to ensure protection of [her] interest as a creditor to the detriment of [Creditors]." Tr. of March 1, 2013 hr'g, 6:7-8.

It inferred that the debtor had fraudulent intent in transferring the Business Assets to Dolores based on the circumstances surrounding the transfer. The bankruptcy court pointed out that Dolores had a close relationship with the debtor because she was his mother. It also noted that the debtor made the transfer very shortly after Creditors initiated the state court action. The bankruptcy court further pointed out that the debtor transferred substantially all of the Business Assets to Dolores which left "other creditors with little from which to recover on their claims." Tr. of March 1, 2013 hr'g, 6:23-24.

However, it found that Creditors failed to show that the Business Assets were the property of the debtor. The bankruptcy court noted that Creditors seemed to rely on its earlier determination in the Preference Adversary. There, in its partial summary judgment order entered January 23, 2013, the bankruptcy court had found that the debtor's transfer of the Business Assets to Dolores under the turnover agreement constituted a preferential transfer under § 547(b). It explained to Creditors

24

that its holding in the Preference Adversary had "no bearing on [its] ruling in this matter" because: 1) the debtor was not a party to the Preference Adversary so he could not raise a defense or submit evidence and legal argument regarding the property transfer's characterization; 2) the evidence and legal arguments presented in the Preference Adversary "were far more extensive and compelling" than the Creditors' presentation in the Discharge Adversary; 3) Creditors provided no evidence showing that the debtor was the alter ego of the businesses, even though a joint pretrial order had listed this as an issue to be determined at trial. Tr. of March 1, 2013 hr'g, 7:10-25, 8:1-18. See Discussion infra. The bankruptcy court concluded that, "absent a finding of alter ego, property belonging to a debtor's wholly-owned corporation is property of that entity and not property of the debtor within the meaning of 727(a)(2)." Tr. of March 1, 2013 hr'g, 10:8-11.

On March 25, 2013, the bankruptcy court entered judgment in favor of the debtor on the § 727(a)(2)(A) claim ("§ 727(a)(2) judgment"). Two weeks later, Creditors filed the motion for new trial.

They contended that they established all of the elements of § 727(a)(2)(A). In particular, Creditors averred that the Business Assets were property of the estate within the meaning of § 727(a)(2)(A). Under California law, when a corporation is dissolved, all of its assets automatically are transferred to its shareholders. When an individual files for bankruptcy, the chapter 7 trustee acquires all of his rights and interests in property. Any property belonging to the debtor thus becomes part

25

of the bankruptcy estate.

Here, the debtor owned all of the stock in the businesses. When the debtor dissolved the businesses shortly before he filed his bankruptcy petition, all of their assets went to the businesses' shareholder – i.e., the debtor. When he filed for bankruptcy, Trustee succeeded to the debtor's rights and interests, including his ownership interest in the Business Assets. The Business Assets thus became part of the bankruptcy estate.

Creditors further argued that, under § 727(a)(7), a debtor's discharge shall be denied if he is an insider of a corporation and had fraudulently transferred the corporation's assets within the meaning of § 727(a)(2). Here, the debtor was an officer and director and sole shareholder of the businesses, which qualified him as an insider. Because he fraudulently transferred the Business Assets to Dolores when he was an insider of the businesses, his discharge must be denied.

Creditors also maintained that the businesses were the debtor's alter egos under California law. In California, a person is the alter ego of his corporation if: 1) he owns all of the corporation's stock; 2) there is such a unity of interest and ownership that the separateness of the person and the corporation has ceased; and 3) an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice. Here, Creditors averred, all three elements of alter ego were met: 1) the debtor wholly owned and controlled the businesses; 2) the debtor admitted at the § 341(a) meeting that he co-owned with the businesses the Business Assets and

26

commingled his personal assets in the Business Assets in such a way that he could not separate them; and 3) adhering to the fiction of the separate existence of the businesses would condone fraud and promote injustice.

Creditors further asked the bankruptcy court to reconsider its grant of partial summary judgment on the § 523(a)(6) claim. Creditors contended that the facts proven at trial showed that the debtor intended "to strip the value" from his corporate stock by transferring the sale assets to Dolores, an insider. In doing so, the debtor caused Creditors willful and malicious injury within the meaning of § 523(a)(6).

Following a hearing on May 7, 2013 ("new trial hearing"), the bankruptcy court denied the motion for new trial. It noted that Creditors did not provide any substantive analysis as to how Civil Rules 52 and 59 and Local Rule 9013-4(a) applied.

The bankruptcy court determined that Creditors misapplied § 727(a)(7). It explained that § 727(a)(7) ties together related cases so that misconduct in one case by an individual may be chargeable against him in other related cases. Here, the businesses never filed for bankruptcy; they were nonbankruptcy insiders.

Moreover, the bankruptcy court reasoned, even if § 727(a)(7) applied to nonbankruptcy insiders such as the businesses, Creditors never included their § 727(a)(7) claim in the joint pretrial order as a claim to be litigated.

As for their arguments regarding alter ego, the bankruptcy court found that Creditors failed to address the lack of evidence of alter ego at trial. They also failed to proffer appropriate

27

analysis of alter ego under Civil Rules 59 and 52.

The bankruptcy court further found unpersuasive Creditors' argument that the debtor's dissolution of the businesses shortly before his bankruptcy filing required the denial of his discharge. It pointed out that Creditors failed to provide any analysis as to how the assets of the debtor's dissolved businesses (if any at the times that the businesses were dissolved) legally reverted to the debtor, as shareholder, prepetition.

The bankruptcy court denied Creditors' request to reconsider its grant of partial summary judgment on their § 523(a)(6) claim because they failed to present any grounds for reconsideration. It moreover mentioned that Creditors were seeking reconsideration of an order that it issued more than two years before.

On May 15, 2013, the bankruptcy court entered the new trial order. Creditors timely appealed the new trial order.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(F) and (J). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1) Did the bankruptcy court err in granting partial summary judgment on the § 547(b) claim by determining that the debtor's transfer of the Business Assets to Dolores constituted a preferential transfer?

2) Did the bankruptcy court err in granting judgment in the

debtor's favor on Creditor's § 523(a)(6) claim?

3) Did the bankruptcy court err in granting judgment in the debtor's favor on Creditors' § 727(a)(2)(A) claim?

### STANDARDS OF REVIEW

We review the bankruptcy court's legal conclusions de novo. Goodrich v. Briones (In re Schwarzkof), 526 F.3d 1032, 1034 (9th Cir. 2010). We also review de novo the bankruptcy court's grant of partial summary judgment. White v. City of Sparks, 500 F.3d 953, 955 (9th Cir. 2007). "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Smith v. Clark Cnty. Sch. Distr., 727 F.3d 950, 955 (9th Cir. 2013)(quoting Furnace v. Sullivan, 705 F.3d 1021, 1026 (9th Cir. 2013)). The moving party has the initial burden of demonstrating that no material fact issues exist. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).

Generally, a court cannot grant summary judgment based on its assessment of the credibility of the evidence presented. Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 707 (9th Cir. 2008)(quoting Agosto v. INS, 436 U.S. 748, 756 (1978)). At the summary judgment stage, the bankruptcy court's function is not to weigh the evidence and determine the truth of the matter. Barboza, 545 F.3d at 707 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Rather, it simply must determine whether there is a genuine issue for trial. Barboza,

29

545 F.3d at 707 (quoting Anderson, 477 U.S. at 249).

We review the bankruptcy court's factual findings under the clearly erroneous standard. United States v. Hinkson, 585 F.3d 1247, 1252 & n.20 (9th Cir. 2009)(en banc). Determinations of alter ego typically are factual findings, which we review for clear error. Schwarzkof, 526 F.3d at 1034 (citing Towe Antique Ford Found. v. IRS, 999 F.2d 1891, 1897 (9th Cir. 1993)). We must affirm the bankruptcy court's factual findings unless we conclude that they are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Hinkson, 585 F.3d at 1252. Clear error exists when, on the entire evidence, the reviewing court is left with the definite and firm conviction that a mistake was made. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. 2009); Hoopai v. Countrywide Home Loans, Inc. (In re Hoopai), 369 B.R. 506, 509 (9th Cir. BAP 2007).

We may affirm on any ground supported by the record. White, 500 F.3d at 955.

## DISCUSSION

A.    Preference Adversary

1.    Motion to Supplement Record

Before we begin our analysis, we must address a procedural matter:  Dolores' motion to supplement the record on appeal ("supplement record motion").  All of the supplemental documents submitted for our review concern Trustee's application to employ Creditors' adversary counsel as his special counsel in the

30

underlying bankruptcy case.[17]

Having reviewed the supplemental documents, we conclude that the supplemental documents would not be helpful in our determination of Dolores' appeal.  We thus deny the supplement record motion.[18]

2.    Appeal of the § 547(b) partial summary judgment order

Under § 547(b), the transfer of a debtor's interest in property made to an insider within one year prior to the debtor's bankruptcy filing may be avoided as a preference if six elements are met.  Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com), 504 F.3d 775, 788 (9th Cir. 2007).  A preferential transfer consists of the following six elements: 1) a transfer of the debtor's interest in property; 2) that was to or for a creditor's benefit; 3) that was for or on account of an antecedent debt; 4) that was made while the debtor was insolvent; 5) that was made up to one year prepetition, if such creditor was an insider; and 6) that was a transfer that enables the creditor to receive more than such creditor would receive in a chapter 7 liquidation of the bankruptcy estate.  Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.), 16 F.3d

---

[17] This same counsel also represented Creditors in the state court action.

[18] Shortly before oral argument, the debtor, Creditors and Dolores each submitted additional authorities in support of their briefs.  The debtor and Dolores objected to Creditors' submissions and moved to strike them.  We deny the debtor's and Dolores' motions to strike.  After considering all of these submissions, however, we conclude that the supplemental authorities cited by the debtor, Creditors and Dolores do not assist us materially in our dispositions of these appeals.

31

313, 315 n.1 (9th Cir. 1994). All six of these elements must be met, Wind Power Sys., Inc. v. Cannon Fin. Group, Inc. (In re Wind Power Sys., Inc.), 841 F.2d 288, 290 (9th Cir. 1988)(en banc) (citation omitted), and each must be proven by a preponderance of the evidence. Arrow Elecs., Inc. v. Justus (In re Kaypro), 218 F.3d 1070, 1073 (9th Cir. 2000).

Dolores claims that she provided sufficient evidence to raise genuine material factual issues as to three of these elements: 1) whether the transfer involved the debtor's property; 2) whether the transfer was made within the preference period; and 3) whether Dolores, as a secured creditor, received more than she would have received in a chapter 7 liquidation.

### a. Property of the debtor

Dolores first argues that she submitted evidence raising questions as to whether the Business Assets ever constituted the debtor's property. Dolores asserts that the debtor never intended to own the Business Assets. She references the Asset Purchase Agreement and the Assignment, both of which provided that Applied would own the Qualtech Assets when the debtor assigned his rights under the Asset Purchase Agreement and made the Assignment to Applied.

Dolores contends that she presented further evidence raising material factual issues as to whether the debtor owned the Business Assets under the alter ego theory. She provided evidence that the businesses each kept separate books and records, even though they operated out of the same facility. Dolores also submitted evidence showing that the businesses did not transfer funds between themselves without regard to source or

32

obligation, as Creditors alleged. The businesses exchanged funds for various goods and services they provided to one another.

However, Dolores seeks to manufacture a genuine issue of fact out of her subjective intent, which is belied by the reality of her documented transactions with respect to the Business Assets. As the bankruptcy court pointed out, Dolores relies on documents that indicated that the debtor owned the Business Assets. The loan resolution agreement was between Dolores and the debtor only. None of the businesses was a party to the loan resolution agreement. The loan resolution agreement further allowed Dolores to take immediate possession of collateral under her loan agreement with the debtor, but the loan resolution agreement did not provide for any transfer of title or ownership. In fact, the loan resolution agreement left the Business Assets in place with the debtor.

Dynamic and Electronic along with the debtor, Dolores and Kaufman Group were parties to the turnover agreement, but Applied was not. Two lists of transferred assets were attached to the turnover agreement, without any indication or division of respective ownership interests among the debtor, Dynamic and Electronic. If the subject lists included any of the Qualtech Assets, to the extent Applied owned them, it was not a party, and the subject assets were not transferred, unless the debtor had a continuing ownership interest in them.[19]

At the summary judgment hearing, the bankruptcy court

_____

[19] Nothing in the record indicates that any interest in the Qualtech Assets ever was assigned or transferred from Applied to either Dynamic or Electronic.

33

highlighted certain language in the turnover agreement indicating that the Business Assets belonged to the debtor. The relevant provision of the turnover agreement stated that the debtor "continuously and irrevocably tender[ed] . . . all right, title and interest and full possession of, in and to all its asset collateral not [now] in [Dolores'] possession . . . ." Such language, the bankruptcy court reasoned, indicated that the debtor owned the Business Assets collateral, lists of which were attached to the turnover agreement. Further, the bankruptcy court concluded that the turnover agreement was more "explicit, in terms of what it says," than the loan resolution agreement. Tr. of Sept. 18, 2012 hr'g, 11:6-7.

Dolores maintains that the actual transfer of the Business Assets occurred on March 31, 2008, more than a year before the debtor filed for bankruptcy protection. Following the transfer on March 31, 2008, she asserts that she owned the Business Assets, which she then leased back to the debtor. The debtor thus did not own the Business Assets during the preference period.

As the bankruptcy court noted, if Dolores actually owned the Business Assets outside of the preference period, then it made no sense (or, as the bankruptcy court put it, was "illogical") for Dolores to file the UCC-1 financing statement on May 27, 2009. Like the bankruptcy court, we too wonder if she truly owned the Business Assets during the preference period, "why on earth would [Dolores] file a UCC-1 in 2009, on her own property?"

On the record before us and then before the bankruptcy court, there is no genuine issue that the debtor owned at least

34

some interest in the Business Assets during the insider preference period. However, even if the businesses owned some of the Business Assets to an unspecified extent, as conceded by Dolores' counsel at oral argument, the debtor's transfer of all the Business Assets to Dolores drained the stock that he wholly owned in the businesses of all value, thus constituting a preferential transfer.

We ultimately conclude, as did the bankruptcy court, that Dolores did not raise a genuine issue of material fact as to whether the debtor had a property interest of some type either in or with respect to the transferred Business Assets for purposes of a determination of preferential transfer under § 547(b).

### b. Preference period

Dolores next argues that she provided evidence raising material factual issues as to whether the debtor transferred the Business Assets to her within one year prepetition. She points to the loan resolution agreement, dated March 31, 2008, under which she allegedly took possession of the Business Assets. According to Dolores, the loan resolution agreement proves that the transfer occurred more than one year before the debtor filed for bankruptcy protection on July 15, 2009.

We give no credence to this argument. As noted above, and as the bankruptcy court reasoned at the partial summary judgment hearing, if Dolores truly owned the Business Assets before the preference period began, why would she file the UCC-1 financing statement on her property on May 27, 2009, and enter into the subsequent turnover agreement that transferred title and ownership of the Business Assets? Such actions indicate that the

35

debtor had not yet transferred the Business Assets to Dolores before the preference period began. Also, the loan resolution agreement does not mention foreclosure by Dolores on the Business Assets, and no notice of the purported transfer was provided at that time to any third parties.

We thus conclude that Dolores did not raise a genuine issue of material fact as to whether the transfer occurred outside of the preference period.

### c. Secured creditor status

Dolores finally contends that she raised a genuine issue of material fact as to whether, as a secured creditor, she received more than she would have in a chapter 7 liquidation. She points out that payments to a fully secured creditor are not preferential because such payments do not deplete the bankruptcy estate. They do not diminish the value of the bankruptcy estate because, while funds are removed from the bankruptcy estate, the secured creditor's lien is reduced in equal amount.

Dolores claims that she submitted evidence showing that she was a fully secured creditor. However, the uncontradicted evidence before the bankruptcy court established that her claimed security interests were unperfected until she filed the UCC-1 financing statement on May 27, 2009 – well within the preference period. Sheehan v. Valley Nat'l Bank (In re Shreves), 272 B.R. 614, 622 (Bankr. N.D.W. Va. 2001)("The trustee is granted the right under the Code to avoid transfers within the preference period, and the perfection of a lien within the preference period is a transfer avoidable by the trustee."); Rouse v. Chase Manhattan Bank (In re Brown), 226 B.R. 39, 45 (W.D. Mo.

36

1998)("The perfection of a lien within the preference period is considered a transfer, which is avoidable by the trustee.").

Dolores also presented evidence to raise questions as to whether the Business Assets had a value that exceeded her secured claim. However, because her security interests were not perfected until late in the preference period, such evidence was ineffectual to raise a genuine issue of material fact.

Based on the foregoing, we determine that Dolores did not present sufficient evidence to raise genuine factual issues as to the three contested elements for a preferential transfer under § 547(b). We thus conclude that the bankruptcy court did not err in granting summary judgment on the § 547(b) claim.

B.    Discharge Adversary

According to their notice of appeal, Creditors appeal the new trial order. But, in their appellate briefs, Creditors appear to be appealing both the § 523(a)(6) partial summary judgment order and the § 727(a)(2)(A) judgment.

1.    Section 523(a)(6) claim

Creditors contend that the bankruptcy court erred in refusing to except their debt from discharge under § 523(a)(6). They argue that they successfully established that the debtor intentionally and fraudulently transferred to Dolores the Business Assets because the bankruptcy court expressly found that he transferred the Business Assets to diminish his bankruptcy estate thereby defrauding his creditors. Creditors maintain that the debtor's intentional and fraudulent transfer constituted a "willful and malicious injury" within the meaning of § 523(a)(6).

As noted above, the bankruptcy court granted summary

37

judgment in the debtor's favor on Creditors' § 523(a)(6) claim for two reasons: First, the § 523(a)(6) claim was not timely filed. Although the parties had stipulated to allow Creditors to amend the Discharge Adversary complaint, there was no agreement that the debtor could not assert an untimeliness defense to any new claims that Creditors might assert in an amended complaint. The deadline to file exception to discharge claims was October 20, 2009. The amended complaint asserting a § 523(a)(6) claim for the first time was not filed until March 16, 2010. The Creditors missed the deadline to assert their § 523(a)(6) claim. Rule 4007(c) provides that, "On motion of any party in interest after hearing on notice the court may for cause extend the time fixed under this subdivision. The motion shall be filed before the time has expired." No such motion was filed by the Creditors to extend the deadline to file their § 523(a)(6) claim. On this record, we perceive no error in the bankruptcy court dismissing the Creditors' § 523(a)(6) claim as not timely filed.

In addition, Creditors misapprehend § 523(a)(6). Section 523(a)(6) essentially encompasses intentional torts. Creditors' claims arise out of breach of contract. Under controlling Ninth Circuit case law, "'a simple breach of contract is not the type of injury addressed by § 523(a)(6).'" Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001)(quoting Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992)). The Ninth Circuit has held that "'an intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful tortious conduct.'" Jercich, 238 F.3d at 1205 (quoting Riso,

38

978 F.2d at 1154 (emphasis in original)). Creditors only have breach of contract claims with an after-the-fact argument that the debtor's alleged fraudulent transfer of the Business Assets to Dolores constitutes a willful and malicious injury. Their embellished breach of contract claim does not support a willful and malicious injury claim within the meaning of § 523(a)(6). See Jercich, 238 F.3d at 1206. We thus conclude that the bankruptcy court did not err in determining, on an alternative basis, that Creditors' debt was not excepted from discharge under § 523(a)(6) due to a lack of evidence of the required subjective tortious intent.

    2.   Section 727(a)(2)(A) claim

We now turn to Creditors' appeal of the bankruptcy court's determination on their § 727(a)(2)(A) claim. Section 727(a)(2)(A) provides that the bankruptcy court must deny the debtor's discharge if the debtor, with intent to hinder, delay or defraud a creditor, transferred property of the debtor within one year prepetition. Aubrey v. Thomas (In re Aubrey), 111 B.R. 268, 273 (9th Cir. BAP 1990). The creditor must demonstrate by a preponderance of evidence that: 1) the debtor transferred or concealed property; 2) the property belonged to the debtor; 3) the transfer occurred within one year of his bankruptcy filing; and 4) the debtor made the transfer with the intent to hinder, delay or defraud a creditor. Id. (citations omitted). The only element at issue on appeal is whether the Business Assets were property of the debtor.

The bankruptcy court found in the Discharge Adversary that Creditors did not meet their burden of proof to establish that

39

the debtor owned the Business Assets for § 727(a)(2)(A) purposes. The fact that the bankruptcy court concluded upon the more extensive evidentiary record and legal arguments presented in the Preference Adversary that a property interest of the debtor had been transferred for preference purposes is not dispositive here.

Creditors argue that they established that the Business Assets belonged to the debtor. Creditors contend that the businesses were the alter egos of the debtor. Specifically, they argue that: 1) the debtor jointly owned the Business Assets with the businesses; and 2) under California law, the shareholders of a dissolved corporation hold legal and equitable title to the dissolved corporation's property, subject to the superior claims of its creditors.

In determining whether alter ego liability applies, we must look to the law of the forum state. Schwarzkopf, 626 F.3d at 1037. Here, California law applies.

California recognizes alter ego liability: 1) "where 'there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased'" and 2) "where 'adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice.'" Id. at 1038 (quoting Wood v. Elling Corp., 572 P.2d 755, 761 n.9 (1977)). This is a highly fact-intensive determination. Factors suggesting an alter ego relationship include "'[c]ommingling of funds and other assets [and] failure to segregate funds of the separate entities . . .; the treatment by an individual of the assets of the corporation as his own . . .; the disregard of legal formalities and the failure to

40

maintain arm's length relationships among related entities . . .' [and] the diversion [of assets from a corporation by or to a] stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets . . . between entities so as to concentrate the assets in one and the liabilities in another.'" Schwarzkopf, 626 F.3d at 1038 (quoting Associated Vendors, Inc. v. Oakland Meat Co., Inc., 26 Cal. Rptr. 806, 813-15 (1962)).

The bankruptcy court found that Creditors presented no evidence establishing that the businesses were the debtor's alter egos, even though the joint pretrial order expressly listed this as an issue to be determined at trial. We agree.

Creditors also contend that upon dissolution of a corporation, its shareholders retain and own its assets. But here, the dissolution of the businesses occurred after the Business Assets already had been transferred to Dolores. By the time the businesses dissolved, they had no assets to distribute to the debtor.

Based on our review of the record, we do not have a firm and definite conviction that the bankruptcy court clearly erred in finding that the Creditors had not met their burden of proof to establish that the Business Assets were the debtor's property in the Discharge Adversary for purposes of their § 727(a)(2)(A) claim.

## CONCLUSION

Both Dolores and Creditors contend on appeal that the bankruptcy court erred in its determinations in the adversary

41

proceedings. Based on our review of the record, we conclude that the bankruptcy court did not err. Accordingly, we AFFIRM the bankruptcy court's rulings on appeal.